[S. F. No. 11654. In Bank.—December 15, 1926.]

BANK OF ITALY (a Corporation), Petitioner, v. JOHN FRANKLIN JOHNSON, as Superintendent of the State Banking Department of the State of California, Respondent.

[1] BANKS AND BANKING — REGULATIONS — POLICE POWER.—The business of banking affects so intimately the commercial welfare and business interests of the people as to render it a proper subject of regulation by the state in the exercise of the police power.

[2] ID. — LIMIT OF REGULATIONS — CONSTITUTION. — The power of the state to regulate banking business is supreme, subject to no limitation so far as the fourteenth amendment to the constitution of the United States is concerned, except that such regulation must be reasonable.

[3] ID.—BRANCH BANKS—PROHIBITION AND REGULATION OF.—Since the state may prohibit branch banks entirely, it may make and enforce any regulations short of prohibition, provided the same be reasonable and uniform.

[4] ID.—BANK ACT—ESTABLISHMENT OF BRANCH BANKS—DISCRETION OF SUPERINTENDENT OF BANKS—PUBLIC CONVENIENCE AND ADVANTAGE.—Under the bank act (Stats. 1909, p. 88), a bank is prohibited from establishing or maintaining a branch office, either in the city of the head office or elsewhere in the state, except upon the written approval of the superintendent of banks, which (a) may be given or withheld in his discretion, and (b) shall not be given by him until he has ascertained to his satisfaction that the public convenience and advantage will be promoted by the opening of the branch office.

---

1. See 4 Cal. Jur. 106; 3 R. C. L. 379.
2. See 4 Cal. Jur. 106.

[5] ID.—PERMITTING BRANCH BANKS—LEGISLATIVE POLICY.—The question of permitting branch banks at all is one of legislative policy on the part of the state.

[6] ID.—DELEGATION OF AUTHORITY—SECTION 9 OF BANK ACT.—The discretion vested in the superintendent of banks by section 9 of the bank act is a lawful delegation of authority to him, but such authority is not without its limitations in law, independent of the statute and in the statute itself, and includes the limitation that the discretion shall be exercised impartially and in such manner as not to infringe upon any constitutional rights of an applicant.

[7] ID.—ADOPTION OF RULES—CURTAILING DISCRETION.—The superintendent of banks may not by the adoption of any rule or policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function.

[8] ID.—EXERCISE OF DISCRETION—TIME.—The superintendent of banks may not refuse to exercise the discretion conferred upon him by the bank act when called upon to do so by an application duly presented to him, but must act upon such application within a reasonable time.

[9] ID.—PUBLIC CONVENIENCE AND ADVANTAGE—DETERMINATION OF.—The legislature has not attempted to define the phrase "public convenience and advantage," as used in section 9 of the bank act, and it is the duty of the superintendent of banks, in the exercise of his power, to ascertain the facts in each case, in which he performs an executive or administrative function and not a judicial one.

[10] ID.—DUTY OF SUPERINTENDENT—DETERMINATION OF PUBLIC CONVENIENCE AND ADVANTAGE—EXTENT OF INTEREST.—In determining the question of public convenience and advantage, on an application to establish a branch bank, the superintendent of banks should first consider the interest of the public immediately contiguous to the proposed branch bank or of the public reasonably subject to service by it, but he may take into consideration the question whether the convenience and advantage of the people of the entire state would be promoted or retarded by the unlimited establishment of state-wide branch banks.

[11] ID.—DE NOVO RULE—GUIDE FOR DEPARTMENT—VALIDITY OF.—The rule called the "de novo rule," adopted by the superintendent of banks, providing in effect that any bank whose main office is located within the limits of a city will be permitted to extend into other parts of that city with branches, on application to the superintendent of banks, and without acquiring another bank, but

any bank located within a city desiring to extend a branch into another city of the state where competition now exists will be required to acquire an existing bank before the request will be granted, subject to exceptions within the discretion of the superintendent, is but a declaration of policy on the part of the superintendent of banks, which is within his power to prescribe, as a rule or guiding consideration of his department, and as a notice to applicants as to the showing necessary to be made.

[12] ID.—ADMINISTRATIVE BOARDS AND OFFICERS—RULES AND REGULATIONS.—The authority of an administrative board or officer, such as the superintendent of banks, to adopt reasonable rules and regulations which are deemed necessary to the due and efficient exercise of the powers expressly granted cannot be questioned. This authority is implied from the power granted.

[13] ID.—FEDERAL RESERVE BOARD—CONTIGUOUS TERRITORY RULE.—The rule of the Federal Reserve Board known as the "contiguous territory rule," providing that that board will as a general principle restrict the establishment of branches, agencies, or additional offices by its member banks or trust companies to the city of location of the parent bank and the territorial area within the state contiguous thereto, as said territory has been defined in the board's previous resolution, excepting in instances where the state banking authorities have certified and the board finds that public necessity and advantage render a departure from the principle necessary or desirable, is a proper administrative regulation.

[14] ID.—ADMINISTRATIVE OFFICER OR BOARD—PROMULGATION OF RULES —POWER.—An executive or administrative officer or board may not, in the promulgation of rules, change, alter, amend, or extend his or its statutory powers.

[15] ID. — "DE NOVO RULE" — DISCRETION OF SUPERINTENDENT OF BANKS.—The so-called *"de novo* rule" of the superintendent of banks does not assume to lay down a general rule legislative in character limiting the exercise of the discretion reposed in him by section 9 of the bank act. The word "require," as contained in the rule, cannot be construed to have a meaning materially different from the statutory word "promoted."

[16] ID. — APPLICATION FOR BRANCH BANK PERMITS — MANDAMUS — PLEADING.—In a proceeding in *mandamus* to compel the superintendent of banks to issue to the petitioner certain permits for the establishment and maintenance of branch banks in certain places, the petition for the writ is vulnerable as against a general demurrer where it is not alleged therein that the capital and

14.  See 21 Cal. Jur. 872.

surplus of the petitioner were at the time of making said applications equal to or in excess of the amount required by section 9 of the bank act for the opening of said branches or that such facts were known to the respondent, or that the petitioner had paid or tendered for payment the fees required by said section 9, or that the petitioner had presented all of the essential facts to the respondent upon which he might properly exercise his discretion, or that the respondent was in possession of the facts of his own knowledge from which the only reasonable conclusion could be drawn that the public convenience and advantage would be promoted by the granting of said applications. These omitted allegations, or the substance thereof, were essential to state a cause of action against the respondent.

[17] ID.—AMENDMENTS TO PETITION—SUFFICIENCY OF.—In such a case, where in advance of a ruling on the demurrer, the petitioner introduced its evidence on the theory that all matters essential to state a cause of action were in issue and the respondent introduced evidence to meet the petitioner's showing thereon, and the petitioner thereafter, by permission of court, filed amendments to the petition supplying the omitted allegations essential to state a cause of action, under the circumstances, the respondent is entitled to have a ruling on his demurrer, and it is held that the petition as amended states a cause of action and the demurrer is overruled.

[18] ID.—PLEADING—DENIALS.—In such a case, where the respondent in his answer denied the material allegations of the petition which are in controversy, under the practice, the allegations of the amendments filed to conform to the proof are deemed denied.

[19] ID.—DENIAL OF APPLICATION—REASONS FOR.—The reasons assigned by the superintendent of banks for the denial of applications for permits for branch banks do not preclude him from thereafter setting up and relying upon any and all legal reasons for denying the same in a proceeding in *mandamus* to compel him to issue said permits.

[20] ID.—REASONS FOR DENIAL—FINDING OF PUBLIC CONVENIENCE AND ADVANTAGE.—In such a case, where the petitioner by its pleading and proof has thrown the case wide open on the question of whether as a matter of law on the face of the record and regardless of the "*de novo* rule," the respondent was compelled to find that the public convenience and advantage would be promoted by the opening of said branches, reasons assigned previously by the respondent in denying said applications should not be held to be determinative of the rights of the parties.

18.   See 21 Cal. Jur. 189.

[21] ID.—MANDAMUS—DISCRETIONARY POWERS.—It is the general rule that the writ of *mandamus* may not be employed to compel a public officer possessing discretionary power to act in a particular way. The court in such a proceeding may compel him to act, but it may not substitute its discretion for the discretion vested in such officer. An important exception to the rule, however, is that if the facts as admitted or proved be susceptible of but one construction or conclusion the right to the writ becomes a matter of law and the officer may be compelled to act in accordance with the facts as admitted or established.

[22] ID.—EVIDENCE — PUBLIC CONVENIENCE AND ADVANTAGE. — In an original proceeding in *mandamus* in the supreme court to compel the superintendent of banks to issue certain permits to the petitioner for the establishment of branch banks in certain localities, where the court is called upon to determine the character and sufficiency of the evidence to justify the writ as against the respondent, it is governed by the rule that if there be any substantial evidence in the record which would have supported a conclusion on the part of the respondent that public convenience would not be promoted by the opening of such branches, the writ must be denied.

[23] ID.—DISCRETION OF BOARDS OR COMMISSIONERS — INTERFERENCE WITH BY COURTS.—When subordinate boards or commissioners are by statute invested with discretion with respect to the exercise of their powers, courts will not interfere with such discretion in the absence of grave reasons tending to show that fraud, corruption, improper motives, or influences, plain disregard of duty, gross abuse of power, or violation of law entered into or characterized the determination of such body.

[24] ID.—LETTER FROM SUPERINTENDENT OF BANKS—ADMISSIBILITY OF. In this proceeding in *mandamus* to compel the superintendent of banks to issue permits for branch banks at certain places, it is held that a letter written by the respondent to the Federal Reserve Board, with reference, among other things, to the former's previous granting of a permit to the petitioner for a branch bank at a certain place, was properly admitted in evidence.

[25] ID.—ABSENCE OF PERMIT FROM FEDERAL RESERVE BOARD—INSUF-FICIENT REASON FOR DENIAL OF WRIT.—In such a proceeding, the fact that the Federal Reserve Board has not granted its permission to the petitioner to open branch banks at the locations in question is not a sufficient reason for denying the writ, as the Federal Reserve Board is an official body entirely independent of any

21.   See 16 Cal. Jur. 809.
23.   See 21 Cal. Jur. 891.

state authority, and the statutory powers and duties of the superintendent of banks should be exercised and discharged independently of any authority having no lawful jurisdiction over him.

(1) 7 C. J., p. 476, n. 21, p. 480, n. 55, 56 New. (2) 7 C. J., p. 480, n. 55; 12 C. J., p. 929, n. 19. (3) 7 C. J., p. 490, n. 31 New. (4) 7 C. J., p. 490, n. 30. (5) 7 C. J., p. 490, n. 30, 31 New. (6) 7 C. J., p. 481, n. 61, p. 490, n. 31 New. (7) 7 C. J., p. 490, n. 31 New. (8) 7 C. J., p. 490, n. 31 New. (9) 7 C. J., p. 490, n. 31 New; 12 C. J., p. 902, n. 33, 34. (10) 7 C. J., p. 490, n. 31 New. (11) 7 C. J., p. 490, n. 30. (12) 7 C. J., p. 481, n. 61. (13) 7 C. J., p. 490, n. 30. (14) 12 C. J., p. 899, n. 98. (15) 7 C. J., p. 490, n. 30. (16) 38 C. J., p. 868, n. 27, p. 869, n. 31. (17) 38 C. J., p. 868, n. 27, p. 904, n. 51. (18) 38 C. J., p. 689, n. 96, p. 743, n. 52; 31 Cyc., p. 460, n. 75. (19) 38 C. J., p. 743, n. 53 New. (20) 38 C. J., p. 887, n. 1. (21) 38 C. J., p. 594, n. 55, p. 597, n. 56. (22) 38 C. J., p. 916, n. 68 New. (23) 38 C. J., p. 916, n. 68. (24) 7 C. J., p. 490, n. 30. (25) 7 C. J., p. 490, n. 31 New.

PROCEEDING in Mandamus to compel the Superintendent of Banks to issue permits for certain branch banks. Writ denied.

The facts are stated in the opinion of the court.

Cullinan & Hickey and Garret W. McEnerney for Petitioner.

James M. Oliver and Elbert W. Davis for Respondent.

Thelen & Marrin, *Amici Curiae.*

SHENK, J.—This is an original proceeding in *mandamus* to compel the respondent superintendent of banks to issue to the petitioner two permits for the establishment and maintenance of branch banks in the city of Los Angeles, one for a branch at North Spring Street and Sunset Boulevard, and the other for a branch in the Building of the Women's Athletic Club at No. 833 South Flower Street.

The petition was filed on June 18, 1925, and an alternative writ was issued, returnable on September 15th. On the return day the respondent filed a demurrer on the ground that the petition did not state sufficient facts to entitle the petitioner to the relief sought and at the same time filed an

answer which, in the opinion of counsel for petitioner, presented issues of fact requiring the taking of testimony. By stipulation, concurred in by the court, Mr. B. Grant Taylor, clerk of this court, was appointed commissioner with the understanding that he should not submit findings on the evidence taken before him, but that the court should make its own findings and draw its own conclusions from the record. It was also agreed that after the evidence was taken and filed the matter should be set down for oral argument. The evidence was taken from time to time before the commissioner, both in San Francisco and in Los Angeles. The hearings were protracted, the last occurring in San Francisco on March 22, 1926. The commissioner thereupon filed a transcript of the evidence which comprises 1,925 pages of oral testimony and 227 exhibits. The matter was set down for oral argument and was argued on April 9 and 10, 1926. On the request of counsel for both sides permission was granted to file briefs, the last one being filed by the petitioner on September 1, 1926. Thereafter, on application of petitioner, but over the objection of respondent, the court, on October 4th, granted leave to file amendments to its petition, which were intended in the main to conform to the proof as counsel for petitioner construed the proof to be, but such leave was granted of course without prejudice to the rights of the respondent in the premises. The matter was thereupon ordered submitted for decision.

The insistence of counsel for respondent that his general demurrer is well taken renders it necessary to determine first the sufficiency of the facts as alleged by the petitioner. In the first cause of action in its original petition it was alleged among other things that the petitioner is a banking corporation incorporated in August, 1904, under the laws of this state with its principal place of business in the city and county of San Francisco; that it is authorized by its articles of incorporation to establish and maintain branch offices in the city and county of San Francisco and elsewhere throughout the state; that on February 1, 1923, the respondent was appointed and became and ever since has been the duly qualified and acting superintendent of banks of the state banking department of the state of California as provided for in an act entitled "An act to define and regulate the business of banking" and known as the Bank Act (Stats. 1909, p. 87),

and amendments thereto; that there are and for some years last past have been two general systems or methods of branch banking sanctioned by law in California, one known as state-wide branch banking, by which a bank maintains its principal office in one city and branches in other cities or towns within the state, and the other known as city-wide branch banking, by which a bank maintains branches in the city in which its principal place of business is located; that banks which do not maintain branches are known as unit banks; that certain banks in San Francisco and Los Angeles, including the petitioner, have adopted a branch banking system for areas beyond the territorial limits of the city in which the principal place of business is located and that the petitioner first entered upon that field and thus far has embarked upon a more extensive area than any other of such banks doing the same branch banking business; that with the exception of petitioner no bank with branches, the principal place of business whereof is north of thirty-seven degrees north latitude (which runs through the extreme southern portion of Gilroy), has established or applied for permission to establish any branch south of said line of latitude and no bank with branches, the principal place of business whereof is south of said line of latitude, has established or applied for permission to establish a branch north of said line of latitude; that both state-wide and city-wide branch banking are authorized by said bank act and have received the approval of the superintendent of banks.

The petition then set forth generally the reasons from the viewpoint of petitioner why as a matter of economic policy state-wide branch banking should be favored, and the status of petitioner as a sound financial institution which conducts a well managed and highly profitable banking business; that with the written approval of respondent or his predecessors in office the petitioner has heretofore opened seventy-eight branch banks in sixty-two cities and towns in the state other than the city and county of San Fransisco, many of which are north and many south of the latitude aforesaid; that it maintains six branches in various parts of the city of Los Angeles; that five of said branches were authorized by the respondent's predecessor in office and the sixth required the written approval of the respondent; that of the branch banks opened and maintained by petitioner all were acquired

by the purchase of existing banks with the exception of twenty, which were newly established, that is to say, were established where no bank had theretofore been conducted, and were and are banking offices commonly known as *de novo* branches. The petitioner then set forth tabulations showing the names of eight of the leading metropolitan banks in San Francisco, Oakland, and Los Angeles and the number of branches maintained by them by purchase and *de novo*. By comparison it is seen that the petitioner maintains ten more branches than the highest in that group of eight and has established a greater proportion of branches by purchase or merger than any bank in the group.

It was next alleged that the petitioner now maintains a branch office on the southwest corner of Temple and Spring Streets in the city of Los Angeles known as its International Branch. This bank was acquired in September, 1917, and before that time was an established and widely patronized independent bank at the same location; that the city of Los Angeles has instituted proceedings to condemn the property on which that branch bank is located, and that by reason thereof said branch must be moved to another location; that with said necessity in view the petitioner applied for and was, by respondent, granted permission to remove said branch bank from its present location to No. 214 North Main Street, which is across the street on Main Street from the present location. In its application for said removal the petitioner also applied for an additional branch at North Spring Street and Sunset Boulevard, a distance of about four blocks northerly from the location of the present international branch office. This application was denied by the respondent and the petitioner now seeks by this proceeding to compel the respondent to grant said application and in that behalf alleges that public convenience and advantage require and would be promoted by the opening of a branch bank at the corner of North Spring Street and Sunset Boulevard, and that unless said permission be granted much business conducted at its present location will be diverted to other banks and public convenience and advantage will be retarded and averted; that there is and has been no evidence of any substantial character justifying the conclusion that the public convenience and advantage would not require or be promoted by the opening of said branch bank and that

the action of the respondent in denying permission to open a branch bank at said new location "was arbitrary and capricious and without support whatever in reason"; that the respondent "ever since his incumbency began on February 1, 1923, has administered his office upon the theory that his decisions were and are to be controlled, and the exercise of his discretion confided to him by section 9 of the Bank Act, is limited by and subordinate to and controlled by a rule of his office commonly called and sometimes herein spoken of as the *de novo* rule"; that Mr. Jonathan S. Dodge, the respondent's immediate predecessor in office, promulgated said rule and throughout his term declared the same to be a valid rule of and within the state banking department; that continuously and ever since the respondent's induction into office he has announced his adherence to said rule and he has promulgated and maintains the same as a valid rule of the state banking department; that in denying the application for said branch the respondent was controlled wholly and solely by said self-imposed *de novo* rule; that it is the claim of the petitioner that there is no statute which gives authority for the promulgation of said rule and that if authority to make and enforce a rule of that character has been given by the legislature such legislation would have been unconstitutional as involving unlawful delegation of legislative power; that in denying said application the respondent did not question the fact that public convenience and advantage would be promoted by the granting thereof and did not find that the public convenience or advantage would not be promoted thereby; that the respondent interprets the said *de novo* rule to mean that occasions might and could arise wherein the public convenience and advantage would be *promoted* by the granting of a permit, but that under the rule the public convenience and advantage must *require* the granting of such permit; that if the word "require" be interpreted to mean anything essentially different from the words "will be promoted" in section 9 of the bank act the said rule would be invalid for this additional reason: that at the time of the making of said application and ever since the public convenience and advantage did require and they do now require the granting thereof; that since November 1, 1921, 103 permits for the establishment of branches *de novo* within the city of Los Angeles to five of the princi-

pal banks of said city have been granted; that during that
period no permit for the establishment of a branch *de novo*
has been granted to the petitioner within that city except the
San Pedro branch, and during said period the petitioner
made no other applications to the respondent for permission
to establish *de novo* branches within the city of Los Angeles
except the application for the branches involved in this pro-
ceeding; that the granting of said 103 permits to the said
five banks, which are all competitors of petitioner in the city
of Los Angeles, has enabled said competitors to secure great
advantages over the petitioner in obtaining new business and
in the accommodation to customers of the banks of the city
of Los Angeles; that public convenience and advantage
would have been promoted and the business of petitioner
would have been benefited by the establishment of *de novo*
branches in the city of Los Angeles since November 1, 1921,
but the petitioner refrained from making application for
permits with the exception of the application for the branch
at San Pedro and the branches involved in this proceeding
because the petitioner believed that such applications would
be denied by the incumbent superintendent of banks for the
reasons involved in the *de novo* rule, for he in terms has
held that the public convenience and advantage would not
be promoted by the establishment of such branches, thereby
putting upon the petitioner the burden of attacking the de-
termination of the incumbent superintendent of banks as
involving abuse of discretion and arbitrary exercise of power,
an issue in which the petitioner was disinclined to become em-
broiled but that longer forbearance has become intolerable.

As and for a second cause of action the petitioner alleged
that on February 28, 1925, it made application in writing to
respondent for his written approval to establish a *de novo*
branch in the building occupied by the Women's Athletic
Club, situated at No. 833 South Flower Street; that on
March 17, 1925, the respondent in writing denied said appli-
cation; that the same was denied "solely upon the ground
that the location of the proposed branch office is outside the
limits of the city in which is located the principal place of
business of the applying bank," meaning thereby that under
the *de novo* rule the petitioner could not obtain permission
to establish branch offices in the city of Los Angeles. The
allegations in the first cause of action with reference to pub-

lic convenience and advantage, evidence concerning the same, the action of respondent and the *de novo* rule, were incorporated in the second cause of action by reference.

In order to determine the sufficiency of the facts so stated by the petitioner it is necessary to examine the law applicable to the establishment and regulation of branch banks in the state of California and to the powers and duties of the superintendent of banks in the premises. In the progress made in the industrial and economic world within comparatively recent years the business of banking has ceased to be, if indeed it ever was, a purely private enterprise. **[1]** Such business affects so intimately the commercial welfare and business interests of the people as to render it a proper subject of regulation by the state in the exercise of the police power (*People* v. *Bank of San Luis Obispo,* 154 Cal. 194 [97 Pac. 306]). The public patronage which the banker invites and receives is of such a character that he becomes in a just sense the trustee of the fiscal affairs of the people of the state (*State Savings & Commercial Bank* v. *Anderson,* 165 Cal. 437 [L. R. A. 1915E, 675, 132 Pac. 755]). **[2]** The power of the state to regulate banking business is supreme, subject to no limitation so far as the fourteenth amendment to the constitution of the United States is concerned, except that such regulation must be reasonable (*State Savings & Commercial Bank* v. *Anderson, supra,* affirmed in 238 U. S. 611 [59 L. Ed. 1488, 35 Sup. Ct. Rep. 792, see, also, Rose's U. S. Notes]. See 4 Cal. Jur., p. 106 et seq.). **[3]** Since the state may prohibit branch banks entirely it may make and enforce any regulations short of prohibition provided the same be reasonable and uniform. It is appropriate to note that under section 90 of the bank act foreign corporations entitled by law to act as trustees in this state are absolutely prohibited from establishing or maintaining, "directly or indirectly, any branch office or agency in this state" (Stats. 1917, p. 601).

Prior to 1909 the state of California had no thoroughgoing law regulating state banking business. Following the general financial depression of 1907 the preparation and adoption of a comprehensive banking law seemed imperative. With the co-operation of the legislative committee of the California Bankers' Association a bill was drafted and passed by the legislature (Stats. 1909, p. 87). That act has

been amended at numerous sessions of the legislature since its original adoption but without any fundamental change in its purport. The act embraces within its regulatory provisions two main subjects of the banking business, departmental banking and branch banking. Within the former field of activity is included the savings, commercial, and trust departments of state banks, but with regulations in that field we are not here concerned. The issues involved in this proceeding directly concern the regulatory provisions of the act relating to branch banking, and particularly the following portion of section 9 thereof:

"No bank in this state, or any officer or director thereof, shall hereafter open or keep an office other than its principal place of business, without first having obtained the written approval of the superintendent of banks to the opening of such branch office, which written approval may be given or withheld in his discretion, and shall not be given by him unless he has ascertained to his satisfaction that the public convenience and advantage will be promoted by the opening of such branch office." (Stats. 1909, p. 88.)

[4] The foregoing provision was incorporated in the original act and has remained unchanged. It is at once observed that there is no uncertainty or ambiguity in the language of the portion of section 9 above quoted. It contains a prohibition of the establishment or maintenance of a branch office, either in the city of the head office or elsewhere in the state, except upon the written approval of the superintendent of banks which (a) may be given or withheld in his discretion, and (b) shall not be given by him until he has ascertained to his satisfaction that the public convenience and advantage will be promoted by the opening of the branch office. [5] It is undeniable that the question of permitting branch banks at all is one of legislative policy on the part of the state. In seventeen states all branch banking is prohibited by law, although in some of said seventeen states the prohibition does not apply to branches established prior to the passage of the prohibitory legislation. Typical legislation prohibiting all branch banking is the statute of Illinois, which was passed by both houses of the legislature, signed by the Governor and later submitted to and approved by a vote of the electors of the state under referendum law on November 4, 1924. This prohibitory statute

is found in Smith-Hurd Illinois Revised Statutes of 1925, at page 177, and is as follows: "No bank shall establish or maintain more than one banking house, or receive deposits, or pay checks at any other place than such house; and no bank shall establish or maintain any branch bank, branch office or additional office or agency for the purpose of conducting any of its business." In six states the law is silent on the subject but branch banking is prohibited under rulings of the attorney-general or the banking commissioner. In five states the law is silent; there is no ruling by the attorney-general or banking department, but no branches are in operation in those states. In nine states branch banking is authorized but is confined to the city of the bank's head office. In two states county-wide branch banking is authorized, and in nine states state-wide branch banking is permitted. The foregoing data is obtained from exhibit 217, which is a transcript of the hearing before the committee on banking and currency in the House of Representatives of the sixty-eighth Congress, first session, on H. R. 6855, of which committee the Honorable Louis T. McFadden of Pennsylvania is chairman. This measure involves, among other things, the scope of proposed federal permission and regulation of branch banking by national banks. An examination of the record of such hearings discloses that the subject of branch banking is fraught with great public interest, is highly controversial, and is wise or unwise dependent upon the particular viewpoint of those affected, or to be affected, by such regulations, existing or proposed.

California is one of the nine states in which state-wide branch banking is permitted. To say that the bank act of this state "gives the right to establish a branch at any point in the state," as contended for by the petitioner, does not correctly reflect the meaning of our statute. Rather it should be said that all branch banking is prohibited in this state with the proviso that a branch bank may be opened at any point in the state upon the written approval of the superintendent of banks, which he may grant or deny in his discretion, and he is specifically enjoined from granting his permission unless and until he has ascertained that the public convenience and advantage will be promoted thereby.

[6] We do not understand the petitioner seriously to claim that the discretion vested in the superintendent of

banks by said section 9 is an unlawful delegation of authority to that official. Indeed, the exercise of a similar discretion by state officials having authority over banks has been upheld in other jurisdictions. (*People* v. *Brady*, 268 Ill. 192 [108 N. E. 1009] ; *Schaake* v. *Dolley*, 85 Kan. 598 [Ann. Cas. 1913A, 254, 37 L. R. A. (N. S.) 877, 118 Pac. 80] ; *State* v. *State Securities Com.*, 145 Minn. 221 [176 N. W. 759] ; *State* v. *State Securities Com.*, 149 Minn. 102 [182 N. W. 910] ; *In re Commercial State Bank*, 105 Neb. 248 [179 N. W. 1021] ; *Matter of Lunghino & Sons*, 176 App. Div. 285 [163 N. Y. Supp. 9] ; *Mulkey* v. *Bennett*, 95 Or. 70 [186 Pac. 1115] ; *Commonwealth* v. *Puder*, 261 Pa. 129 [104 Atl. 505] ; *Mee* v. *Hirning*, 45 S. D. 582 [189 N. W. 675] ; *State* v. *Hill*, 84 W. Va. 468 [100 S. E. 286]. See, also, *Engel* v. *O'Malley*, 219 U. S. 128 [55 L. Ed. 128, 31 Sup. Ct. Rep. 190].) The petitioner has cited no authority holding that such discretion may not lawfully be vested in an executive or administrative officer of the state banking department. We therefore conclude that the discretion so lodged in the superintendent of banks in this state is a lawful delegation of authority to him. But such authority is not without its limitations in law independent of the statute and in the statute itself. Included in the limitations in law independent of the statute is that the discretion thus conferred shall be exercised impartially and in such manner as not to infringe upon any constitutional right of an applicant. [7] It is also clear that the superintendent of banks may not by the adoption of any rule of policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function. [8] Another limitation in law is that the superintendent of banks may not refuse to exercise the discretion thus conferred when called upon to do so by an application duly presented to him, but must act upon such application within a reasonable time. The statutory limitation on his authority to act is that he is prohibited from granting his written approval unless and until he has ascertained that the public convenience and advantage will be promoted by the opening of the branch bank permission to establish which is sought.

[9] The legislature has not attempted to define the phrase "public convenience and advantage." Nor has it attempted to declare where or how or under what circumstances the public convenience and advantage would cr would not be promoted by the opening of a branch bank in any particular case. The obvious reason for the omission to define the phrase is because it would seem to be impossible to define it so that the definition would comprehend every variety and set of circumstances surrounding each particular application for the facts and circumstances in each case would necessarily be different, at least so far as local conditions were concerned. So, too, it is impossible for the court to lay down any hard-and-fast rule that would be applicable to every case, and the ingenuity and resourcefulness of counsel have not suggested how or in what manner a general rule could be devised. The phrase would seem to be as difficult of definition as "police power," "public convenience and necessity," "due diligence," or "probable cause," as those expressions are used in our law. But the impossibilities of definition do not detract in the least from the necessity of undertaking the task and of ascertaining the facts in each case, and it is for the superintendent of banks to so proceed and to ascertain them in the exercise of his power. In that exercise he performs an executive or administrative function and not a judicial one.

[10] Furthermore, the legislature has not attempted to indicate whether in the use of the word "public" in the phrase "public convenience and advantage" reference was thereby made to the people of the state at large or to the people of the particular portion of the public affected or to be served by the particular branch bank sought to be established. We incline to the view that the interest of the public immediately contiguous to the proposed branch bank or of the public reasonably subject to service by the proposed branch should first be considered by the superintendent of banks, but we are not prepared to hold that the superintendent of banks may not in the administration of the duties imposed upon him take into consideration the question whether the convenience and advantage of the people of the entire state would be promoted or retarded by the unlimited establishment of state-wide branch banks.

He is a state-wide officer and as such is not limited by the statute to purely local considerations in passing upon any application for his written authority. Such being the fact, we do not feel justified in laying down a rule that would remove from his consideration all questions of state-wide policy in the administration of his office.

[11] With the foregoing observations as to the scope and effect of section 9 of the bank act, and of the powers of the superintendent of banks thereunder, we pass to a consideration of the history, authority and construction of the *de novo* rule promulgated by the respondent's predecessor in office and thereafter adhered to.

Since the adoption of the bank act in 1909 it has been the general policy of the successive superintendents of banks not to permit the establishment of branch banks outside the city of the head office except by purchase of or merger with an existing bank in such outside city or town. As this policy was adhered to and enforced it was realized that the restriction should not be deemed inflexible or absolute, but that exceptions should be made in proper cases when in the discretion of the superintendent of banks such exceptions should be made. The respondent's immediate predecessor in office, Mr. Jonathan S. Dodge, appears to have been the first to formulate the policy into a written rule of the state banking department. On his own initiative Mr. Dodge called a conference of the legislative committee of the California Bankers' Association and after discussing with them the necessities of the banking situation in California explained the rules which he proposed to set in motion. Thereafter he carried his plan into execution. On November 22, 1921, he addressed a letter to Mr. Leo V. Belden, vice-president of petitioner at San Francisco, wherein he stated in part: "In the conference with the legislative committee, the matter of the allocation of branch banks in California was discussed very fully by all present. After hearing all sides of the matter, I have decided that the policy of my department will be as follows: First: Any bank whose main office is located within the limits of a city will be permitted to extend into other parts of that city with branches, on application to the superintendent of banks, and without acquiring another

200 Cal.—2

bank. Second: Any bank located within a city, desiring to extend a branch into another city of the state where competition now exists, will be required to acquire an existing bank before the request will be granted. This rule will be subject to exceptions such as I made in your behalf at Sacramento, and I hope the exceptions will be few. . . . Fourth: All banks that may be members of the Federal Reserve Bank will be required to secure the consent of that institution before any franchises are authorized. . . . I think I said to you that the calling of this conference was occasioned by conditions in Southern California, and in no wise related to the activities of your bank.'' Mr. Dodge appeared as a witness in this proceeding and was interrogated by counsel for petitioner as to the history and origin of the *de novo* rule. He was asked to explain the circumstances and conditions which caused him to promulgate it and he answered: ''As Superintendent of Banks, it was a very live question at that time about the establishment of branches, particularly of branches in small cities; and the bankers, the independent bankers in the small cities, were very much exercised for fear that their territory would be invaded by branches of big banks, and that their business would be sacrificed thereby. The first big contest, I guess, came on probably at Santa Maria and the second was at Sacramento, and after we had hearings on these two, other requests came in for branches, particularly one at San Pedro. I saw that some plan, method or rule should be laid down that would govern the establishment of banks in other cites and in other localities than the main office, and I had prepared what I thought was a good rule to follow, and which is practically stated in that letter [referring to letter of November 22, 1921, above referred to], and I called together the legislative committee of the Bankers' Association of the State of California in meeting, and presented it to them, and discussed with them the advisability of making it one of the rules for the governing policy of the State Banking Department of California. And that was held in the latter part of November, about the time this letter was written, probably a few days prior to it.'' He was then asked why he formulated that rule and he answered: ''Well, it was pretty nearly necessary in order to have any sort of

comfort in the office of the Superintendent of Banks. It was necessary. It had to come. I won't say that I was the first man who ever thought of the *de novo* rule. I guess that my predecessors in office had thought of it and would have established it. I can't say. Perhaps I was the first man that wrote it out and put it in words. Probably that is the truth of the matter." He was asked: "Well, now, was this rule adopted as the result of an agreement, or was it a dictated rule—dictated by you as Superintendent of Banks?" and he answered: "It was dictated by me, yes, sir. This is the rule of the Banking Department." This general policy was adhered to by Mr. Dodge during the remainder of his administration. When the respondent came into office on February 1, 1923, he continued in adherence to the same policy. The legislature was then in session and certain amendments to the bank act had been proposed by the Calfornia League of Independent Bankers, the purpose of which, among other things, was to provide by law that "no branch banking system shall maintain more than one office in any municipality other than that wherein is located the parent office." At the request of the California League of Independent Bankers these proposals were transmitted to the members of the executive committee of the California Bankers' Association, which was composed of eleven officers and representatives of leading banks in the state, including Mr. W. R. Williams, cashier of the petitioner. Thereafter a conference was held between the respondent and said executive committee at which it was agreed that it would be advisable to leave the statutory provision as incorporated in section 9 of the bank act unchanged, but that the state banking department should continue to adhere to the policy announced in the *de novo* rule. This plan was agreeable to all of the representatives of the California League of Independent Bankers and to the members of the executive committee of the California Bankers' Association with the exception of the representative of the petitioner. Thereafter the respondent announced the continuance of the policy of his department with reference to branch banking as set forth in the rules promulgated by his predecessors in office and first reduced to writing by Mr. Dodge. The rule as announced by the respondent

was in more condensed form and was and is as follows: "No branch of any bank shall be created in any locality other than the city or locality in which is located the principal place of business of such bank except by purchase of, or consolidation or merger with, an existing bank in such city or locality in which it is desired to create or establish such branch bank, unless the superintendent of banks in his discretion shall find that the public convenience and advantage require it."

[12] It is the contention of petitioner that the adoption of and adherence to the said *de novo* rule is an unlawful assumption of legislative power. The authority of an administrative board or officer, such as the respondent, to adopt reasonable rules and regulations which are deemed necessary to the due and efficient exercise of the powers expressly granted cannot be questioned. This authority is implied from the power granted. The petition concedes and states the rule to be that if the power "had not been expressly but merely implied the result would be the same for whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed." (*Johnston* v. *Baker*, 167 Cal. 260 [139 Pac. 86].) In *St. Charles State Bank* v. *Wingfield*, 36 S. D. 493 [155 N. W. 776], cited and relied upon by petitioner, the court held invalid a certain rule adopted by the superintendent of banks in South Dakota, but guarded its ruling by the following language: "In holding this particular rule promulgated by the public examiner to be void, we are not to be understood as denying the public examiner full authority to adopt and promulgate any rule or regulation necessary or proper in the discharge of particular administrative duties imposed by statute. In all such matters he may properly exercise reasonable discretion in the adoption of reasonable rules within the purview of the particular provision of the statute which imposes the duty. . . . By way of illustration, the statute imposes upon the public examiner the duty and authority to approve banks as reserve depositaries. In the discharge of this duty, he may adopt any reasonable rule as to the method of procedure or the showing required, upon which such approval will be given." Under the authority of the National Bank Act the controller of the currency, as shown by exhibit

216 herein, has adopted rules and regulations relating to the establishment of offices by national banks. It is interesting to note that among those rules is one that a "national bank will be permitted to establish such an office only within the limits of the city, town or village named in its organization certificate as the place where its operation of discount and deposits are to be carried on," and also upon a showing to the controller that the facts and conditions make it necessary to establsh such office. [13] Likewise, the Federal Reserve Board has adopted a rule governing its member banks and known as the "contiguous territory rule," which provides: "The Federal Reserve Board will as a general principle restrict the establishment of branches, agencies or additional offices by such banks or trust companies to the city of location of the parent bank and the territorial area within the state contiguous thereto, as said territory has been defined in the Board's resolution of November 7, 1923, excepting in instances where the state banking authorities have certified and the Board finds that public necessity and advantage render a departure from the principle necessary or desirable." The resolution defining the term "contiguous territory" defines the same as "the territory of a city or town whose corporate limits at some points coincide with the corporate limits of the city or town in which the parent bank is located." The petitioner is a member of the Federal Reserve System and it does not appear that such a rule is not a proper administrative regulation.

[14] It is contended by petitioner and is well established that an executive or administrative officer or board may not, in the promulgation of rules, change, alter, amend, or extend his or its statutory powers. [15] But petitioner contends that the *de novo* rule assumes to lay down a general rule legislative in character limiting the exercise of the discretion reposed in the respondent by section 9 of the bank act. In consonance with the foregoing concededly correct rule it is obvious that if the word "require" as contained in the rule be deemed to have a meaning materially different from the statutory word "promoted" and as such would have the effect of restricting the statutory powers of the superintendent of banks such rule would be invalid. The word "require" is defined to

mean "to demand; to claim by right and authority; to exact; to demand as appropriate; to need, or call for." To "need" is given as a synonym. The word "promote" is defined to mean "to contribute to the growth, enlargement, or prosperity of; to forward; encourage; advance." One of its synonyms is to "help." (Webster's New International Dictionary, latest edition, Merriam Service, p. 1812.) Roget in his International Thesaurus of Words and Phrases, at pages 258 and 300, gives one use of the word "require" as in the sense of "need, want, or have occasion for," and the word "promote" in the sense of "aid, assistance, help, or advancement." With these different shades of meaning applied to those words it is at once difficult if not impossible for this court to determine as a matter of law on the face of the *de novo* rule that any alleged difference in their meaning could have any practical effect in the administration thereof. It would seem to be true that if the public convenience and advantage would be promoted by the establishment of a *de novo* branch such public convenience and advantage would require its establishment. Conversely, if the public convenience and advantage would require the establishment of a *de novo* branch its establishment would promote the public convenience and advantage. Whether the respondent in the application of the *de novo* rule has overstepped his statutory duty or authority will be referred to later in the consideration of the evidence.

When the rule on the face thereof is thus construed as in harmony with section 9 of the bank act it is but a declaration of policy on the part of the superintendent of banks. It is set up for the guidance of his own department in the orderly and efficient discharge of the duties of his office and is also a notification to banking corporations under his jurisdiction to the effect that if and when they desire a branch bank outside of the city of the head office a *prima facie* showing of the promotion of public convenience and advantage will be deemed to have been made when it appears that by purchase, consolidation, or merger the applying bank has acquired the control of an existing bank at the location of the proposed branch in such outside city, and that when the applying bank proposes to establish a *de novo* branch in such outside city

the fact that it is to be a *de novo* branch will in itself constitute some showing that public convenience and advantage will not be promoted by the establishment of the new branch and will cast upon the applicant the burden of showing that an exception to the general rule should be made—the final ruling of the superintendent of banks to be subject at all times and in every case to the statutory power and duty of the superintendent of banks to deny the application unless he shall first ascertain that the public convenience and advantage will be promoted by the opening of the new branch. Such an announced policy we consider within the power of the superintendent of banks as a rule or guiding consideration of his department, and as a notice to applicants as to the showing necessary to be made, and as such is a valid regulation of the state banking department.

[16] Having in mind the foregoing determinations as to the powers and duties of the superintendent of banks and as to the proper construction of the *de novo* rule, and assuming that the original petition otherwise stated a cause of action to compel the respondent to act or to act in a particular manner, we are confronted with certain deficiencies in the said petition which render it vulnerable as against the general demurrer. For instance, it is not alleged therein that the capital and surplus of the petitioner were at the time of making said applications equal to or in excess of the amount required by section 9 of the Bank Act (Stats. 1909, p. 88), for the opening of said branches or that such facts were known to the respondent. It was not alleged that the petitioner had paid or tendered for payment the fees required by said section 9 (Stats. 1917, p. 602). It was not alleged that the petitioner had presented all of the essential facts to the respondent upon which he might properly exercise his discretion (*Sleeper* v. *Board of Supervisors*, 60 Cal. App. 744 [214 Pac. 292]). It was not alleged that the respondent was in possession of the facts of his own knowledge from which the only reasonable conclusion could be drawn that the public convenience and advantage would be promoted by the granting of said applications. These omitted allegations, or the substance thereof, were essential to state a cause of action against the respondent. [17] In advance of a

ruling on the demurrer the commissioner was appointed and the parties proceeded to produce evidence before him. The petitioner appears to have introduced its evidence on the theory that all matters essential to state a cause of action were in issue and the respondent introduced evidence to meet the petitioner's showing thereon. The petitioner, in the amendments to the petition which this court permitted to be filed, supplied the omitted allegations essential to state a cause of action. The court was prompted to grant leave to file said amendments not on the theory that the subject matter thereof had been proved in its entirety, for the evidence had not then been examined at length, but rather that the case might be determined on its merits. Under the peculiar circumstances here presented the respondent is nevertheless entitled to have a ruling on his demurrer. In the exercise of our discretion we will consider the demurrer as interposed to the petition as amended. With the amendments the petition states a cause of action and the demurrer is overruled.

[18] In his answer the respondent denied the material allegations of the petition which are in controversy and under the practice the allegations of the amendments filed to conform to the proof are deemed denied (*McDougald* v. *Argonaut Land Co.*, 117 Cal. 87 [48 Pac. 1021]; *Glougie* v. *Glougie*, 174 Cal. 126 [162 Pac. 118]). He then affirmatively alleged that, since the adoption of the bank act in 1909, 109 permits for branch banks have been issued to the petitioner by the state banking department. From the tabulation presented it appears that of this number thirty-four have been issued since January 1, 1923. He set forth at length the situation as to the business conditions and banking facilities existing at the time the applications here in suit were made and in the localities where it was sought to establish said *de novo* branches; that he had made a personal examination of the situation on the ground before he denied said applications and that as a result of said examination and investigation and from his personal knowledge of the existing conditions he had determined that public convenience and advantage would not be promoted by the opening of said branches, and that he denied said applications for that reason; that the conditions as they existed at the time of the exercise by him of his dis-

cretion in so ascertaining and at all times since said action was taken would not warrant the opening of said branches; that he has adhered to the *de novo* rule only in the sense that he had made use of the same as a guide or policy and not as a controlling factor in the exercise of his discretion and that he has never permitted it to limit, modify, or interfere with the exercise by him of his statutory discretion; that in the exercise of said power and in the discharge of his duties under the bank act and under the *de novo* rule he has considered each application for permission to open a branch bank on its own merits and has treated applications from all banks seeking such permits with like consideration; that the reason why the petitioner has not applied for more permits for *de novo* branches outside the city of its head office and particularly in Los Angeles is not alleged in the petition, but that the true reason is that the Federal Reserve Board has refused its permission to open such *de novo* branches, and if it were not for that fact the petitioner would have applied ·to him for numerous other branches *de novo* in Los Angeles and elsewhere, and in this connection alleges that on December 13, 1922, a permit was issued by his predecessor in office to the petitioner to open a *de novo* branch office at Yuba City, but that such branch has never been opened for the reason that the Federal Reserve Board denied petitioner's application therefor; that on July 13, 1923, the respondent issued to petitioner his written authority to open a *de novo* branch at Santa Maria and that said branch has never been opened because the Federal Reserve Board denied its permission; that on March 2, 1923, he granted petitioner his permission to open a *de novo* branch at Sacramento and that the Federal Reserve Board likewise denied its permission for that branch; that he granted permission to open a branch bank by purchase or merger with a local bank at Kingsburg, but that the Federal Reserve Board denied its permission to open said branch.

The respondent then set forth at length the history of the *de novo* rule and its general approval by the California League of Independent Bankers and by the unanimous action of the California Bankers Association in convention assembled; also the reason from the viewpoint of the respondent for the existence of the *de novo* rule and the rea-

sons why the said rule should be deemed a wise and salutary policy as affecting business and economic conditions in the state at large and why the continued adherence to the same should not be disturbed.

With the issues thus framed and presented we are brought to a consideration of the evidence. It is unnecessary, and indeed it would be futile, to attempt to state the same in detail within the confines of this opinion. With the latitude accorded the parties before the commissioner any and all evidence having any real or probable pertinency to the issues involved seems to have been elicited. We will, therefore, of necessity, set forth only portions of the evidence and be content with a reference to the remainder and then announce our findings and conclusions on the material portions thereof.

In proof of the allegation that the respondent had denied the applications here in suit solely because of the existence of the *de novo* rule the petitioner introduced in evidence a letter from respondent dated March 10, 1925, which was in response to the petitioner's application for the opening of the branch on South Flower Street. In this letter the respondent stated in part: "I regret very much the necessity of denying this application. This denial is based solely upon the ground that the location of the proposed branch office is outside of the limits of the city in which is located the principal place of business of the applying bank. As perhaps you may know, I have announced and agreed to certain rules regarding the granting of branch offices, one of which is that no *de novo* permissions for branch offices shall be granted for a location outside of the city in which the principal place of business of the applying bank is located. There is no application which has come to me to which I would rather give my sympathetic and affirmative consideration than this one of yours, but unfortunately I consider that I am bound in the exercise of my discretion by the rule above referred to." This letter was addressed to the petitioner and was signed by the respondent in his official capacity. The respondent testified that said letter did not set forth the true reason for the denial of the application; that said application was denied after his personal survey and inspection of the local conditions and an ascertainment by him that the public convenience and advantage would

not be promoted by the granting thereof; that said letter was drafted by a subordinate in his office after a conference with him as to what action should be taken on the application, and that he did not instruct his subordinate how to word the letter; that said letter was signed by him as a matter of office routine and that he did not recall that the letter he signed was so worded. But it does not appear that he was laboring under any disability and the responsibility was his. The considerations urged by him in disparagement of the import of the language of the letter are not appealing. He must be held to have meant what the letter stated, as those dealing with him as a public officer had a right to assume that the language was authoritative.

In his letter to the petitioner of date March 20, 1925, which was in response to petitioner's application to remove its International Branch from its then location to No. 214 North Main Street and to establish the new and additional branch at North Spring Street and Sunset Boulevard, the respondent stated in part: "We note your application for permission to move your International Branch in the City of Los Angeles to the premises commonly known as No. 214 North Main Street. Permission is hereby given to make this transfer and our license for the new address will be issued as soon as the date of opening at the new location has been fixed. We also note your application for permission to establish a branch 'de novo' to be located at the Northwest Corner of North Spring street and Sunset Boulevard in the city of Los Angeles. . . . I regret that it is not possible for me to grant this application under the conditions which govern the exercise of my discretion in the matter of establishing branch offices. You are familiar with the ruling of this department issued March 8, 1923, affecting the granting of permission for the establishment of branch offices in localities outside the city wherein is located the head office of the applying bank. While I appreciate the needs of your business as you see them, there are other banks in Los Angeles situated about as you are in this Civic Center removal. I am unable to believe that the public convenience and advantage 'requires' at least three new branch offices in the City of Los Angeles because of the changes incident to the creation of this new Civic Center.

. . . While I appreciate your own point of view in this matter, I cannot believe that you are suffering any injustice in not receiving permission to establish *de novo* an additional branch office in the City of Los Angeles in consideration of being obliged to move your present International Branch.'' This letter was likewise signed by the respondent in his official capacity. He testified that it was also drafted by a subordinate in his office and was signed under like circumstances as the letter of March 10th and after an ascertainment by him that the public convenience and advantage would not be promoted by the granting of the application. Our conclusion with respect to the authenticity of this letter is the same as announced concerning the other. In each case the reason assigned for the denial was unauthorized. The respondent misconceived the effect of the *de novo* rule as *preventing* favorable consideration of said applications. His discretion under the statute could not thus be circumscribed. Under the law he had the power to grant the applications notwithstanding the *de novo* rule. Even under the language of the rule itself he could have granted them provided he ascertained that the public convenience and advantage would be promoted thereby.

The position taken by the respondent as evidenced by those letters amounted to a failure or refusal to act and exercise his discretion, as the law required. Said letters when considered alone and without reference to any other evidence would justify the issuance of the peremptory writ to compel the respondent to act in accordance with his statutory powers, but the petitioner is not seeking the issuance of the writ to compel the respondent to act but seeks the issuance thereof to compel him to grant said applications.

[19] We are not at liberty to accord to the language of said letters of denial the determinative importance contended for by petitioner. The reasons assigned for the denial of said applications did not preclude the respondent from setting up in this proceeding and relying upon any and all legal reasons for denying the same. The leading case in this state on this subject is *Ward* v. *Flood,* 48 Cal. 36 [17 Am. Rep. 405]. In that case the mother of a negro

girl sought in a *mandamus* proceeding to compel the principal of the Broadway Grammar School in San Francisco to receive the girl as a pupil in said school. The petitioner alleged that the principal had refused to admit the girl to the school, "assigning as the only reason for such refusal the fact that she was a colored person." In his answer the principal set up another defense, namely, that the lowest grade in his school was the sixth grade, and that the girl had not received sufficient instruction to enable her to enter that grade. The petitioner made a motion for the issuance of the peremptory writ notwithstanding the matters alleged in the answer. The writ was denied, and as to the right of a public officer to set up in such a proceeding any lawful reason in opposition to the issuance of the writ the court said: "There is no doubt that if a party, upon tender or demand made, or other proceeding *in pais*, had put his refusal upon some particular omission or defect in the proceedings of his adversary, he will not afterwards be permitted, in support of such refusal, to allege a new or additional defect or insufficiency in these proceedings, especially if such defect or insufficiency be of such character as that it might have been cured if it had been pointed out or relied upon at the time. This is the ordinary and general rule, and it proceeds upon the idea that having specially designated one or more supposed insufficiencies the party thereby waives and abandons all others. But it is obvious that this rule can have no just application to the case now under consideration. If the law, under the circumstances actually appearing in the record before us, forbade the respondent, as the principal of the school, to admit the petitioner as a pupil therein, the circumstances that the respondent put his refusal on an untenable ground ought not in this proceeding to preclude an examination into the very right of the case. The claim of the petitioner to be admitted, and the corresponding duty of the defendant to admit her as a pupil, are governed by law; and if it appear, and it does unquestionably appear, upon the record before us, that she did not possess the requirements, in point of learning, sufficient to entitle her, whatever her color, to be admitted to any class in the school, even the lowest, then the respondent must be considered to have correctly

refused to have entertained her application for admission, and the legal sufficiency of the particular reason assigned by him for such refusal becomes wholly immaterial." (See, also, *Berger* v. *Justice,* 4 Cal. App. 532 [88 Pac. 591].) The petitioner seeks to avoid the applicability of the case of *Ward* v. *Flood, supra,* on the ground that the allegations of the answer therein were admitted. We are unable to discover any difference in principle between that case and the case at bar. The respondent herein alleged in his answer that his denial of said applications was based also on the ground that he had ascertained that the public convenience and advantage would not be promoted by the granting thereof. In his testimony he stated and reiterated that such was the fact and gave his reasons therefor and in the many days of his examination at the hands of counsel for petitioner his testimony was not seriously discredited. In one of the amendments to the petition it is alleged that the respondent in denying said applications "found and determined that public convenience and advantage would be promoted by the opening of said branches." There is no evidence in the record to support said allegation and the same is found to be untrue. The contrary under the evidence is found to be true, namely, that the respondent has never at any time found that public convenience and advantage would be promoted by the opening of said branches. For the foregoing reasons the claim of petitioner that because respondent's letters predicated his denial upon the existence of the *de novo* rule all other questions must be deemed resolved in its favor cannot be sustained.

[20] There is another reason why said letters of the respondent should not be held determinative of the rights of the parties herein. It is this: That the petitioner by its pleading and proof has thrown the case wide open on the question of whether as a matter of law on the face of the record and regardless of the *de novo* rule the respondent was compelled to find that the public convenience and advantage would be promoted by the opening of said branches; or, to put it another way, whether the showing is sufficient to authorize the court to find and conclude as matter of law that the respondent could have drawn but one conclusion from the facts before him, namely, the conclusion

that the public convenience and advantage would be pro-
moted by the granting of said applications. The law bear-
ing on the solution of the problem thus presented is well
settled. [21] It is the general rule that the writ of
*mandamus* may not be employed to compel a public officer
possessing discretionary power to act in a particular way.
The court in such a proceeding may compel him to act,
but it may not substitute its discretion for the discretion
vested in such officer. This general rule is well stated with
supporting authority in 16 Cal. Jur., at page 809, as
follows: "It is a familiar rule governing the issuance of the
writ of mandate that an officer in whom public duties are
confided by law is not subject to the control of the courts
in the exercise of the judgment and discretion which the
law reposes in him as a part of his official functions.
*Mandamus* may not compel the exercise of such discretion
in any particular manner; it may only direct that the officer ·
act, and must leave the matter as to what action he
will take to his determination." (See, also, 38 C. J. 594.)
An important exception to the foregoing general rule is that
if the facts as admitted or proved be susceptible of but
one construction or conclusion the right to the writ becomes
a matter of law and the officer may be compelled to act
in accordance with the facts as admitted or established
(*Dufton* v. *Daniels,* 190 Cal. 577, and cases cited on page
581 [213 Pac. 949]). Cases further illustrating the excep-
tion to the general rule are *Inglin* v. *Hoppin,* 156 Cal. 483
[105 Pac. 582], *Hammel* v. *Neylan,* 31 Cal. App. 21 [159
Pac. 618], and *Walker* v. *Kingsbury,* 36 Cal. App. 617
[173 Pac. 95]. That the exception to the general rule is
well established can admit of no doubt, but where the facts
are not admitted and are controverted and are susceptible
of more than one construction or conclusion and are sus-
ceptible of the conclusion adverse to the claimed right the
writ should be denied. We are brought, then, to this
question: Are the facts contained in the record before us
susceptible of but one reasonable construction or conclu-
sion, namely, that the public interest and advantage would
be promoted by the opening of said branch banks? In
answering this question we may not permit ourselves to be
governed by the preponderance of evidence rule such as

governs a trial court or jury in an ordinary civil action. If that rule were to be applied we would be called upon to find and decide whether the petitioner had proved by a preponderance of evidence that public convenience and advantage would be promoted by the opening of said branches. This we may not do. [22] When the court is called upon, as in this case, to determine the character and sufficiency of the evidence to justify the writ as against the respondent we are governed by the rule that if there be any substantial evidence in the record which would have supported a conclusion on the part of the respondent that public convenience and advantage would not be promoted by the opening of such branches the writ must be denied. The rule which applies here is analogous to the rule that if there be any substantial evidence to support the finding of a trial court on an issue of fact, such finding may not be disturbed even though the court on appeal might consider that the evidence preponderated the other way. Applying, then, the rule which must govern in this case we find evidence at great length on both sides of that question. On the one hand, the petitioner has presented volumes of evidence by witnesses examined orally, and by maps, plats, surveys, records, and charts to prove that public convenience and advantage would be promoted by the opening of said branches. On the other hand the respondent has presented evidence to prove that public convenience and advantage would not be promoted thereby. From an examination of the record and giving due credit to the material evidence therein presented it must be said that there is evidence of a very substantial character to support the conclusion that the public convenience and advantage would not be promoted by the opening of said branches. It may also be said that there is very substantial evidence to support the contrary conclusion. But when once we determine from the evidence presented that the conclusion could have been either for or against the petitioner's applications the inquiry is at an end. To hold otherwise would be to substitute the discretion of the court for the discretion of the superintendent of banks under the statute and to transfer from the duly constituted officer of the state to the court the power and the resultant duty of supervising to that extent the state banking de-

partment. It is conceivable that in connection with every application facts of a substantial character might appear in support of one conclusion or the other. The court might thus be called upon to ascertain the facts and to draw its own conclusions therefrom in the case of every application to the superintendent of banks and his action thereon. It would be manifestly improper for the court, under the law, to undertake that task.

The many cases cited and relied on by petitioner, among which are *Riley* v. *Chambers,* 181 Cal. 589 [8 A. L. R. 418, 185 Pac. 855], *Tulare Water Co.* v. *State Water Com.,* 187 Cal. 533 [202 Pac. 874], *Tarpey* v. *McClure,* 190 Cal. 593 [213 Pac. 983], are cases wherein a public officer or board was compelled to act in a particular way by reason of the fact that he or it had no discretion in the premises or had improperly assumed discretion or having discretion the facts entitling the aggrieved party to the relief sought either as admitted or proved were solely susceptible of the construction or conclusion that as matter of law the relief sought should be granted. This is not such a case and the authorities relied upon are inapplicable.

The petitioner concedes that the *de novo* rule, which the respondent in a sense inherited from his predecessor and thereafter adhered to, was not designed to discriminate against it, but claims that the respondent acted arbitrarily in connection with said applications and in the enforcement of said rule which by its terms is alleged to be discriminatory. As to the disability or restriction which the respondent assumed himself to be laboring under by reason of the existence of the *de novo* rule, as expressed in his written denials, the petitioner's charge is sustained, but as the rule is a valid rule the action of the respondent thereunder becomes immaterial if it now appear that there were valid reasons for his denial of said applications. Notwithstanding the fact that we hold the reasons assigned for the denial of said applications in the respondent's letters of denial to be untenable, still we are met by the determinative consideration that by pleading and proof, regardless of the *de novo* rule and regardless of the said denials, the record in this proceeding presents substantial evidence sufficient to have supported the denial of said applications on legal grounds.

[23]   In the recent case of *Doble Steam Motors Corp.* v. *Daugherty*, 195 Cal. 158 [232 Pac. 140], this court approved another guiding principle to be applied to a case where it is sought, in a court proceeding, to interfere with discretionary power of a public board or officer. That was an application for a writ of mandate to compel the commissioner of corporations of this state, another state-wide officer possessing broad powers and duties of a discretionary nature, to issue his permit to the petitioner therein authorizing the latter to issue and deliver certain shares of its capital stock to certain individuals. It was decided that the facts presented were sufficient to support a denial of the application. In the course of the opinion the court said: "In the case of *Union Transp. Co.* v. *Bassett*, 118 Cal. 604 [50 Pac. 754], which was a proceeding in equity brought to enjoin the board of harbor commissioners from putting into effect an order of said board with respect to certain docking facilities, this court held that when subordinate boards or commissioners were by statute invested with discretion with respect to the exercise of their powers, courts would not interfere with such discretion in the absence of grave reasons tending to show that fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power, or violation of law had entered into or characterized the determination of such body; and that in the absence of such showing of an abuse of discretion the determination of such board or commission would not be interfered with or overthrown." There is no showing herein, either by pleading or proof, of fraud, corruption, improper motives, or influences on the part of the respondent. If it be assumed that in assigning untenable reasons for the denial of said applications the respondent was guilty of "plain disregard of duty" and consequent violation of the statute by refusing to exercise his discretion as required, we are brought back to the proposition that what the petitioner desires herein is not the issuance of a writ to compel the respondent to act but to compel him to act favorably on said applications. Here, again, it must be said that the untenable reasons assigned for denial became and are immaterial in the state of the record.

[24] On October 8, 1923, the Federal Reserve Board received a communication from some of the banks of this state concerning the action of the respondent in passing upon certain applications for branch banks, in which communication the respondent was requested to set forth his position with reference to the matters contained in said communication. In reply the respondent, over his signature, in his official capacity, and of date October 30, 1923, submitted a communication to the Federal Reserve Board, in which he stated that in his opinon branch banking in California had been such as to justify its continuance in this state, and that whatever might be said as to branch banking generally it is and has been a success in California. He then referred to the fact that conferences had been held with reference to proposed legislation designed to curtail, if not to prohibit, further branch banking in this state, and his determination to adhere to the *de novo* rule as a guiding consideration in his department within his statutory powers and duties. Continuing he said in part: "So far as I am aware, and judging from the reports of the Washington hearing that have come to me, the only instance where the propriety of a branch charter granted by me has been seriously questioned is that granted to the Bank of Italy for a branch *de novo* at Santa Maria. The Santa Maria situation had been an acute one for a considerable time, far antedating my incumbency as Superintendent of Banks. No profit can come from my entering into a discussion here of the merits of the Santa Maria situation. I accept the responsibility for the decision and wish to say that it was my own independent decision; that I knew at the time a former Superintendent of Banks had refused permission and I was well aware of the fact that there would be considerable criticism and a great deal of misunderstanding of my motives in the event that I did grant permission to the Bank of Italy to enter Santa Maria *de novo*. . . . The decision was made solely on the grounds of public convenience and necessity and I wish to say here that nothing has since been presented to cause me to change the opinion that I then formed that the people of Santa Maria were entitled to additional banking facilities. I do not intend to enter into a defense of my position in this matter any further than this and to state

that so far as the conference agreement with reference
to branch banking is concerned, the decision in the Santa
Maria case was made with that agreement entirely before
my mind and that the decision was made, not in violation
of that agreement, but rather as coming within the excep-
tion laid down in that agreement which had been very
carefully placed therein at the suggestion of my attorney
at the time the agreement was entered into. He pointed
out the fact that to permit the agreement to be made hard
and fast so that no banks *de novo* should be granted to
branch banks would be to abdicate the authority granted
me in the Bank Act and would be in violation of my oath
to accept the duties and responsibilities of that Act, i. e.,
to refuse to determine for myself in obedience to the man-
date of that Act in each and every instance where appli-
cation is made, whether 'the public convenience and
advantage would be promoted' by the granting of the
charter to the applicant. More than that, it was then
pointed out and the logic apparently appealed to all the
conferees that discretion should reside in the Superin-
tendent to deal with those instances where through failure
to keep pace with the demands of the community the
local banks had failed to meet the requirements of local
service. Instead of incorporating the language of the stat-
ute into the exception, the language was changed from the
'public convenience and advantage be promoted thereby'
to 'public convenience and advantage require it'; in other
words the shade of difference runs from the rather mild
word 'promoted' to the somewhat positive word 'require,'
and in my finding after a personal investigation of con-
ditions at Santa Maria I so found and have advised the
Bank of Italy that I would give them permission to enter
the town of Santa Maria upon the ground that I found
the conditions to come within the exception laid down in
this limitation, to-wit: That the public convenience and
advantage of Santa Maria require further banking facili-
ties.'' The foregoing communication to the Federal Re-
serve Board, its authenticity and the foundation for its
introduction in evidence, formed the subject of much con-
troversy between counsel. It is sufficient to say that it is
deemed properly in evidence.

Respondent testified that his attorney drafted the said communication, that it was so prepared in the nature of a brief, and that although the attorney seemed to have attempted therein to draw some "fine-haired" distinction between the meaning of the words "require" and "promote," he was unable to draw the same or any differentiation in their meaning and that in the practical application of the rule there was, to his mind, no distinction between the two words. Here again the respondent must be held to have meant what he said, regardless of who drafted the letter. Counsel for petitioner stresses at length the alleged significance to be attached to the phraseology employed by the respondent in said communication seeking thereby to demonstrate that in the practical application of the rule the respondent has given the word "require" a more restrictive meaning than the word "promote." There is merit in the petitioner's criticism of the attempt thus, in the face of the statute, to draw any distinction between the meaning of the words. But when the words are properly given no difference in meaning, the said communication indicates clearly that in the application of the *de novo* rule the respondent was duly cognizant of his statutory powers and duties under his oath of office.

The petitioner charges that the California League of Independent Bankers, the members of which were apprehensive of their security and of further invasion of their territory by branches of metropolitan banks, forced the respondent to adhere to the *de novo* rule and that it was only after the respondent's agreement to continue to adhere to it that the advocacy and support of legislation pending in the legislature of 1923 and designed practically to prohibit all branch banking was withdrawn by the independent bankers. The record supports the conclusion that the insistence of the independent bankers for legislation on the subject and the withdrawal of their support of pending measures were considerations in the mind of respondent in his decision to continue the rule. But we discover nothing that took place reflecting in any derogatory sense upon the action of the respondent or of the independent bankers in the premises, nor do we perceive how the validity of the rule could be affected by these questions of legislative and administrative policy which contributed to the decision to adhere to it.

[25] It is insisted by the respondent that to issue the writ as sought would in any event be a vain and useless thing, for the reason that the Federal Reserve Board has not granted its permission to the petitioner to open branch banks at the locations in question. We think the contention without merit for two reasons. First, the Federal Reserve Board is an official body entirely independent of any state authority, and the respondent is not responsible to that board in the exercise of his statutory powers, although he might properly feel called upon to act in co-operation with that board consistently with his duties under state law; and, secondly, the Federal Reserve Board might adopt and enforce a rule to the effect that it would not grant branch bank permits until the state superintendent of banks had first granted his permission. Each application might thus be brought to a standstill at the outset. Without question the statutory powers and duties of the respondent should be exercised and discharged independently of any authority having no lawful jurisdiction over him.

Many additional points are discussed in the briefs, but we deem it unnecessary specifically to refer to them in view of what has been decided.

We therefore find and conclude in accordance with the foregoing: 1. That section 9 of the bank act constitutes a lawful regulation governing the establishment and maintenance of branch banks in this state. 2. That the discretion vested in the superintendent of banks by said section is a lawful delegation of authority to him to be exercised within the limitations expressed in the section itself and as otherwise provided by law as above indicated. 3. That the *de novo* rule on the face thereof is a lawful exercise of the powers of the superintendent of banks as a policy to be followed by him and as an indication to applicants for branch bank permits of the showing necessary to be made to entitle them to obtain affirmative action on their applications, but in no sense as restricting, modifying, or controlling his statutory discretion. 4. That the reasons assigned by the respondent for his denial of said applications in his communications of March 10 and 20, 1923, were insufficient but that such untenable reasons did not preclude him from setting up herein additional and valid reasons for such denial. 5. That substantial evidence to support the conclusion that public

convenience and advantage would not be promoted by the opening of said branch banks appears in the record; assuming that said evidence be sufficient to support a conclusion the other way on that issue, nevertheless this court should not substitute its discretion for the discretion vested in the superintendent of banks. 6. That the respondent has at no time ascertained that the public convenience and advantage would be promoted by the opening of said branch banks and that the contention of the petitioner that the respondent was bound to ascertain such fact as matter of law on the face of the record is not sustained. 7. That taken as a whole the record does not present facts justifying the issuance of the writ as sought.

The peremptory writ is therefore denied and the proceeding is dismissed,

Richards, J., Curtis, J., Waste, C. J., Finlayson, J., Sullivan, J., and Seawell, J., concurred.